UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

In re                                  Chapter 11

FRESH HARVEST RIVER LLC          Case No. 10-_____( )

                 Debtor.
-------------------------------------------------------x

## AFFIDAVIT OF JACK GRAY PURSUANT TO LOCAL RULE 1007-2 IN SUPPORT OF FIRST-DAY MOTIONS AND APPLICATIONS

STATE OF NEW YORK            )
                               **ss:**
COUNTY OF NEW YORK         )

Jack Gray, being duly sworn, hereby deposes and says:

1.      I am the Manager of Fresh Harvest River LLC ("FHR" or the "Debtor"). The Debtor commenced a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on the date hereof (the "Petition Date"). In my capacity as Manager, I am familiar with the day-to-day operations, business, and financial affairs of the Debtor.

2.      I submit this Affidavit pursuant to Rule 1007-2 of the Local Bankruptcy Rules of the Southern District of New York (the "Local Rules") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case and in support of the first-day motions and applications filed contemporaneously herewith.

3.      Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my discussions with other members of the

Debtor's senior management, my review of the relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor's operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Affidavit. I am authorized to submit this Affidavit on behalf of the Debtor.

## I.     THE DEBTOR AND EVENTS LEADING TO THE CHAPTER 11 CASE

4.     The Debtor is a privately held New Hampshire limited liability company with its principal office located in New York, New York.

5.     The Debtor is a manufacturer of food products whose production facilities are located in a state of the art food manufacturing facility located in Dubois, Pennsylvania (the "Facility"). The Facility is a 28 acre campus with over 200,000 square feet, including 50,000 square feet of on-site storage for customers' production storage needs. The Facility is FDA approved, certified organic, Kosher and Halal and is fully approved by the Commonwealth of Pennsylvania. The physical plant was designed and built for maximum durability, flexibility and efficiency which gives the Debtor a significant competitive advantage.

6.     As of July 31, 2010, the Debtor's unaudited consolidated assets totaled approximately $820,849 and recorded consolidated liabilities totaled approximately $5,592,925. Consolidated revenues for the seven months ended July 31, 2010, were approximately $2,587,277.

7.     FHR currently employs 41 full-time employees and 7 part-time employees, 14 of which are salaried employees. Its products include mayonnaise, ketchup, spaghetti and pasta sauces, pizza sauces, salad dressings, marinades, barbeque

2

sauces, salsas, cocktail sauces, cheese sauces, cheese dips, pancake syrup, caramel coffee flavorings, chocolate coffee flavorings and café latte flavorings. The Debtor's products are typically sold under its customers' labels. FHR combines traditional recipes with state-of-the-art technology to satisfy the needs of its customers in the retail, private label, food service and specialty food industries.

8. The Debtor was formed in the spring of 2009 as a result of discussions between one of the Debtor's secured lenders, First Commonwealth Bank (the "Bank") and the Debtor's managers and Jack Gray, a principal. In or about 2007, the Bank, pursuant to a foreclosure, took title and possession of the Facility and equipment located thereon (the "Equipment"). In the spring of 2009, the Bank asked Mr. Gray to consult with it and create and develop a plan for the use and ultimate sale of the Facility and Equipment. Mr. Gray and the Bank enjoyed previous business dealings with each other and the Bank knew of Mr. Gray's substantial experience in the food business.

9. Following extensive discussions, the Debtor and the Bank agreed that the Debtor would keep the Facility open and continue manufacturing operations with a view to eventually acquiring it. This arrangement was highly beneficial to the Bank as without FHR's agreement to continue operations, the Facility and Equipment would have rapidly deteriorated in value. In anticipation of this transaction, FHR entered into a temporary lease for the Facility for monthly rent of $1.00. The lease term was extended from time to time up through and including August 31, 2009. The Debtor also entered into a lease for the Equipment with a purchase option feature (the "Equipment Lease"). In June of 2009, the Debtor entered into an agreement with the Bank for up to $3 million in financing for working capital under a revolving loan agreement (the "Revolver") and

3

up to $3 million in a non-revolving loan agreement (the "Non-Revolver"). In addition, during the spring and summer of 2009, the Bank and the Debtor reached a series of agreements that caused the Debtor to assume operation of the Facility including the following:

> \*     a sale agreement pursuant to which the Debtor would purchase the Facility and Equipment for $26 million ($10 million for the Facility and $16 million for the Equipment) (the "Agreement of Sale");

> \*     a $7.5 million purchase money loan for the acquisition of the building and land on which the Facility is located (the "Loan");

> \*     a mortgage on the Facility (the "Mortgage");

> \*     an escrow agreement relating to the holding and release of executed documents (collectively, the "Agreements"); and

> \*     a short term lease of the Facility which expired by its express terms on or before October 30, 2009 (the "Second Amended Lease").

10.     As a result of what has been called the "Great Recession" which, among other things, adversely affected the real estate market and consumer food demand, and the deteriorated health of its financial partner, the Bank and the Debtor agreed, subsequent to August 2009, that the price terms set forth in the Agreement of Sale had been rendered impractical. As a result, the closing date on the Agreement of Sale was adjourned without date. The parties left unmodified, and agreed that final terms had been reached, with respect to the fully executed Mortgage. The Bank and the Debtor agreed in good faith to restructure the pricing of the transaction and, in the meantime, FHR continued to build its business to the benefit of and with encouragement from the Bank.

4

Since it commenced operations, the Debtor has substantially increased the volume of its orders as well as the quality and size of its customers.

11.    During the course of their contract restructuring discussions, numerous meetings were held with the Bank and with representatives of potential investors interested in injecting new capital into FHR to facilitate closing of the transaction. During this period, in order to enhance its business operations, the Debtor purchased additional equipment with the proceeds of the Non-Revolver.

12.    Prior to January, 2010, the Debtor was financed entirely by borrowings under the Revolver and the Non-Revolver. By the beginning of 2010, however, the Debtor had exhausted its availability to borrow under these credit lines. Accordingly, the Debtor sought out additional outside financing. Catahama LLC agreed to provide additional financing secured by the Debtor's receivables. The Debtor contacted the Bank which agreed to release and/or subordinate its security interests in new receivables so that the Catahama financing could be effectuated. The new financing was beneficial to the Bank because it enabled the Debtor to continue to operate and enhance the value of the Facility without the Bank having to loan additional funds.

13.    In early 2010, the Debtor began courting Kerry, Inc. and The Kerry Group (collectively, "Kerry"), a large Irish food conglomerate, as a potential customer. In anticipation of a business relationship, and under the terms of a confidentiality agreement, Kerry proceeded to repeatedly send its employees and agents, including engineers, to examine the Facility, the Debtor's business and manufacturing methods. Kerry, having visited the Facility, interviewed FHR employees and executives, developed

5

a favorable opinion of the quality of work that the Facility and the Debtor's skilled employees were capable of producing. Kerry promised orders for products in the range of 8 million cases - a very substantial production level - and placed an initial order of 250,000 cases to be produced and delivered within 30 days. Due in large part to the success of these orders and the impressiveness of the Facility and the business the Debtor had developed, Kerry expressed an interest in purchasing the Facility and Equipment.

14.     On or about April 8, 2010, Kerry and the Debtor executed a letter of intent (the "April 8th Letter") pursuant to which, subject to further agreement, Kerry would acquire the Facility and Equipment (collectively, the "Property") from the Debtor for a purchase price of $22 million. During this time, the Debtor was in a position to fully consummate its renegotiated purchase transaction with the Bank and could either finalize the acquisition of the Property from the Bank and sell to Kerry, or it could retain the Property if Kerry reneged or otherwise attempted to renegotiate at a price unacceptable to the Debtor (as was possible under the April 8th Letter). Thereafter, unbeknownst to the Debtor, Kerry contacted the bank in an attempt to acquire the Property directly from the Bank. That contact, and the discussions and subsequent agreements between Kerry and the Bank violated Kerry's obligation of good faith implicit under the April 8th Letter and the express terms of the confidentiality agreement. In addition, that contact led to the Bank's subsequent breach of the Agreement of Sale.

15.     By letter dated May 6, 2010 (the "May 6th Letter"), the Bank purported to deliver "formal notice" to the Debtor of the Bank's termination of the Agreement of Sale, purportedly based upon, among other things, the fact that the closing did not occur on or before October 30, 2009, notwithstanding the parties' agreement to

6

adjourn closing without date and the ongoing discussions regarding the pricing term for the sale of the Property. The May 6th Letter also advised the Debtor of the Bank's purported termination of the lease of the Facility effective as of May 31, 2010. Thereafter, on July 15, the Bank sent a second termination, without explanation, instructing the Debtor to quit the Facility by July 26, 2010 even though the Debtor was fully current in connection with any arrearages for possession claimed by the Bank. However, notwithstanding these purported terminations of a lease, the Debtor, subsequent to October 30, 2009, did not occupy the Facility pursuant to any lease as any lease would have expired by its own terms on that date. Rather, the Debtor remained in possession of the Facility in order to facilitate its arrangement with the Bank.

16. By letter dated May 18, 2010 (the "May 18th Letter"), the Bank purported to accelerate its Non-Revolving Line of Credit, based upon its claimed failure to cure a purported default. Almost immediately thereafter, on or about May 27, 2010, Kerry wrote a letter to the Debtor terminating and revoking the April 8th Letter claiming that it did not need to negotiate with the Debtor as title to the Facility remained with the Bank at that time. Concerned that the Bank and Kerry were acting in concert to disrupt the consummation of the Bank/Debtor purchase transaction, on or about May 28, 2010, the Debtor wrote to Kerry warning that it was in violation of the April 8th Letter.

17. During June, 2010, the Bank continued to negotiate with the Debtor while surreptitiously conducting parallel negotiations with Kerry. On June 3, 2010, an attorney for the Bank met in New York City with a potential new investor (and

then-current secured creditor), Herbert Feinberg[1] of Catahama LLC ("Catahama") and Debtor members Jack Gray and Paul Grillo (and Catahama's counsel). Catahama, at that time, was ready, willing and able to assist in financing the Debtor's purchase of the Property. During that meeting, Catahama made an offer in connection with FHR of $15 million to consummate the purchase of the Property and Gray and Grillo agreed, as part of a comprehensive workout with the Bank, to continue to resolve certain remaining issues under the Revolver and Non-Revolver. In connection with this offer, Mr. Feinberg presented a Letter of Intent to the Bank confirming the details of its predominantly cash offer. On June 10, 2010, at the Bank's request, Feinberg flew to Pittsburgh to meet with representatives of the Bank. At that meeting, the purchase offer was increased to $16.5 million. The Bank stated that it was willing to proceed to close the transaction for the sale of the Property for $16.5 million and agreed to continue to negotiate a resolution of the issues involving the credit lines.

18. On or about July 2, 2010, the Bank and Kerry entered into a purchase and sale agreement for the Property for, upon information and belief, a price of $20 million. In connection with that agreement, the Bank demanded that the Debtor quit possession of the Facility on July 26, 2010.

19. On or about July 20, 2010, the Debtor brought suit in the United States District Court for the Southern District of New York (the "SDNY Action") against the Bank and Kerry seeking damages and declaratory relief. Specifically, among other things, the Debtor sought damages from Kerry under breach of contract and tortuous

---

[1] Although there had been pre-petition discussions regarding Mr. Feinberg becoming a member of the Debtor, it does not appear that any formal documentation admitting Mr. Feinberg was ever finalized. Thus, the Debtor does not believe that Mr. Feinberg ever formally became a member of the Debtor.

8

interference with contract theories, and sought specific performance of the Agreement of Sale and a declaration that the Agreement of Sale, the Loan Agreement and the Mortgage were all in full force and effect, that the Debtor was current on all payments required under the Mortgage, that no use and occupancy was owed, that no default was properly asserted by the Bank under the Mortgage and that the purported termination of the Debtor's rights in the Facility and Equipment was null and void. The Debtor also sought to have the agreement between Kerry and the Bank annulled and to enjoin the Bank from exercising certain "Confession[s] of Judgment in Ejectment" contained in the Equipment Lease, the Non-Revolver, the Revolver and the Mortgage.

20.     Following an objection to venue by the Bank, the SDNY Action was transferred to the United States District Court for the Western District of Pennsylvania. The matter has been referred to the Court's alternative dispute resolution program.

21.     On or about July 28, 2010, the Bank filed suit in the Court of Common Pleas of Clearfield County, Pennsylvania (the "Clearfield County Court") seeking the ejectment of the Debtor from the Facility on an *ex parte* basis. The Clearfield County Court initially ordered the ejectment of the Debtor from the Facility. However, the Debtor thereafter obtained a stay of enforcement of the ejectment order and the Debtor currently remains in legal occupancy of the Facility. The Clearfield County Court ordered that a $20 million bond be posted by 3:00 p.m. on September 13, 2010 in connection with the stay.

22.    The Debtor filed this chapter 11 case (the "Chapter 11 Case") in order to obtain some breathing room and to remain in legal possession of the Facility while it attempts to reorganize.

## II.    THE FIRST DAY MOTIONS

23.    The Debtor intends to file the following First Day Motions, which require a hearing on an emergent basis.

- <u>Application for Authorization to Pay Pre-Petition Wages</u>:    The Debtor seeks authorization to pay the pre-petition wages and benefits of the Debtor's employees.    The Debtor seeks authorization to pay approximately $74,000.00 in accrued pre-petition compensation and employee benefit obligations.

- <u>Application for Authorization to Obtain Post-Petition Financing</u>: The Debtor seeks authorization to obtain debtor-in-possession financing from Catahama LLC in the amount of $100,000.00, secured by non-priming liens on unencumbered assets of the Debtor.    This financing is necessary to ensure the continued operations of the Debtor during the initial stages of the bankruptcy case.

## III.    INFORMATION REQUIRED BY LOCAL RULE 1007-2

24.    Local Rule 1007-2 requires certain information related to Debtor, which is set forth below.

25.    The information required by Local Rule 1007-2(a)(1) is set forth in Part I above.

26.    In response to the information requested in Local Rule 1007-2(a)(3), to the best of my knowledge, no committee has been organized prior to the Petition Date.

HF 6051195v.2 #99999/1000

27.     Pursuant to Local Rule 1007-2(a)(4), Schedule 1 hereto lists the following information with respect to each of the holders of the Debtor's 25 largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address, and telephone number; the name(s) of person(s) familiar with the Debtor's accounts, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed or partially secured.

28.     Pursuant to Local Rule 1007-2(a)(5), Schedule 2 hereto provides the following information with respect to the Debtor's secured creditors, on a consolidated basis: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; the amount of the claim; a brief description of the collateral securing the claim; an estimate of the value of the collateral and whether the claim or lien is disputed.

29.     Pursuant to Local Rule 1007-2(a)(6), Schedule 3 provides a summary of the Debtor's assets and liabilities.

30.     In response to the information requested in Local Rule 1007-2(a)(7), the Debtor does not have any publicly held stock, debentures or other securities.

31.     In response to the information requested in Local Rule 1007-2(a)(8), the Debtor does not have any property in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditors, or agent for any such entity.

HF 6051195v.2 #99999/1000

32.     Pursuant to Local Rule 1007-2(a)(9), Schedule 4 hereto provides a list of the premises owned, leased or held under other arrangement from which the Debtor operates its business.

33.     Pursuant to Local Rule 1007-2(a)(10), Schedule 5 hereto provides the location of the Debtor's substantial assets, the location of its books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

34.     Pursuant to Local Rule 1007-2(a)(11), Schedule 6 hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtor or its property.

35.     Pursuant to Local Rule 1007-2(a)(12), Schedule 7 hereto provides a list of the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

36.     Pursuant to Local Rule 1007-2(b)(1)-(2)(A), Schedule 8 hereto provides the estimated amount of bi-weekly payroll to the Debtor's employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholder, directors and financial and business consultants retained by the Debtor, for the thirty (30) day period following the filing of the Debtor's chapter 11 petition.

HF 6051195v.2 #99999/1000

37.     Pursuant to Local Rule 1007-2(b)(3), Schedule 9 hereto provides for the thirty (30) day period following the filing of the chapter 11 petition, a list of estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

38.     The foregoing is true to the best of my knowledge, information and belief.

FRESH HARVEST RIVER LLC

Debtors and Debtors in Possession

By: _____

Jack Gray,
Manager

Sworn to and subscribed before me, a notary public for the State of New York, County of New York, this 12th day of September, 2010.

_____
Notary Public

SHELBY KELLEHER
Notary Public, State of New York
No. 01KE6207081
Qualified in New York County
Commission Expires June 8, 2013

13

**Schedule 1**

**List of Creditors Holding 25 Largest Unsecured Claims**

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following is a list of those creditors holding the 25 largest unsecured claims against the Debtor, on a consolidated basis. This list has been prepared from the books and records of the Debtor, and in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure in connection with the filing of the Debtor's chapter 11 petitions. This list does not include (a) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, (b) secured creditors unless the value of the collateral is less than the total amount of such creditors claim or (c) claims held by any of the Debtor's employees.

The information set forth on the Schedule shall not constitute an admission of liability by, nor is binding on, the Debtor, and the failure to list a claim as contingent, disputed or subject to set-off shall not be deemed a waiver of any of the Debtor's rights related thereto.

**[SEE FOLLOWING PAGE]**

HF 6051195v.2 #99999/1000

| nount Due | Status | CREDITOR NAME AND ADDRESS | Tel. Number | Fax Number | E-mail address |
|---|---|---|---|---|---|
| $3,625,393 | Contingent, unliquidated and disputed | FIRST COMMONWEALTH BANK<br>601 PHILADELPHIA STREET<br>INDIANA, PA 15701<br>ATTN: DAVID HEPLER, SR. VP | 724-541-5400 | | dhepler@fcbanking.com |
| $350,000.00 | | PETER ROMANO<br>14 WOODS OF ARDEN RD.<br>STATEN ISLAND, NY 10312 | 718-873-3736 | | peterromano@si.rr.com |
| $145,117.72 | | ELMAR<br>200 GOULD AVE<br>PO BOX 245<br>DEPEW, NY 14043 | 267-321-6662 | 614-777-9639 | |
| $113,000 | | DIT<br>325 BEAVER DRIVE<br>PO BOX 527A<br>DUBOIS, PA 15801 | 814-372-1500 | 814-375-0718 | draybuck@ditllc.net |
| $45,480.00 | | WILLIS INSURANCE COMPANY<br>ONE GLENLAKE PARKWAY<br>11TH FL<br>ATLANTA, GA 30328 | 404-302-3835<br><br>404-244-5001 | | Heather.folson@willis.com<br>Terry.mitchelitch@willis.com |
| $35,000.00 | | WILLA ABRAMSON<br>200 CENTRAL PARK SOUTH<br>NEW YORK, NY 10019 | 786-275-6658 | | Edabramson200@aol.com |
| $34,702.02 | | GOOD FOOD, INC.<br>P.O. BOX 160<br>4960 HORSESHOE PIKE<br>HONEY BROOK, PA 19344 | 866-763-9469 | 610-273-7652 | ORDERS@LOAR-YOUNG.COM |
| $33,734.60 | | HIGHMARK BLUE SHIELD<br>PO BOX 382146<br>PITTSBURGH, PA 15250 | 812-273-6000 | 812-273-6002 | |
| $27,896.65 | | DESIGN SPECIALISTS<br>1200 GULF LAB ROAD<br>PITTSBURGH, PA 15238 | 412-826-1988 | | mjr@designspecialistsinc |
| $24,053.00 | | CROWN CLOSURES AMERICA<br>1440 PAYSPHERE CIRCLE<br>CHICAGO, IL 60674 | 585-223-6114 | 585-223-6712 | Janet.goretsky@crowncork.com |
| $24,000.00 | | US BANCORP<br>BUSINESS EQUIP. FINANCE GROUP<br>1810 MADRID STREET<br>MARSHALL, MN 56258 | 888-339-7887 | | Glenda.werkman@usbank.com |
| $21,250.00 | | EDWARD JENNINGS PS<br>101 TUDOR LANE SUITE A<br>YARDLEY, PA 19067 | 215-428-3420 | | Karen@edwardjenningsps.com |
| $20,400.00 | | PRO REFRIGERATION INC.<br>PO BOX 1528<br>AUBURN, WA 98071 | 800-468-7543 | 513-759-4270 | |
| $19,769.14 | | CARGILL INC.<br>PO BOX 640283<br>PITTSBURGH, PA 15264 | 937-497-4366 | 937-497-4152 | Betty_hohenstein@cargill.com |
| $18,660.44 | | STRATEGIC GROWTH PARTNERS, INC.<br>760 ROSEDALE AVE<br>ROESELLE, IL 60172 | 507-532-7772 | | jmartin@goldenstatefoods.com |

15

| | | | | |
|---|---|---|---|---|
| $15,000.00 | NEEMAR INC.<br>2 ANCO DRIVE<br>PO BOX 5539<br>DEPTFORD, NJ 08096 | 920-233-3268 | 920-233-3159 | |
| $14,568.77 | ALL-PAK INC.<br>PO BOX 641087<br>PITTSBURGH, PA 15264-1087 | 412-564-2449 | 412-319-1143 | PERTTIC@ALL-PAK.COM |
| $13,688.53 | NERCON ENG. & MFG., INC.<br>P.O. BOX 2288<br>3972 SOUTH U.S. HWY 45<br>OSHKOSH, WI 54902 | 317-702-5787 | 312-803-2117 | TLACROIX@NERCON.COM |
| $13,635.00 | FOOD SAFETY NET SERVICES<br>PO BOX 659789<br>SAN ANTONIO, TX 78265-9789 | 210-308-0675 | 210-308-8730 | dmorgenroth@food-safetynet.com |
| $13,400.54 | MASTERTASTE, INC.<br>D/B/A KERRY INGREDIENTS &<br>FLAVOURS<br>12116 COLLECTIONS CENTER DRIVE<br>CHICAGO, IL 60693 | 800-300-2321 | 856-227-0384 | |
| $13,341.66 | MIDLANTIC FLOW COMPONENTS, LLC<br>1041 GLASSBORO RD #E-4<br>WILLIAMSTOWN, NJ 08094 | 888-296-5299 | 888-297-5299 | csmith@midlanticflow.com |
| $12,373.91 | GASBARRE PRESS DIVISION<br>590 DIVISION ST<br>PO BOX 1022<br>DUBOIS, PA 15801-1022 | 814-371-6387 | | |
| $11,425.00 | NYK LOGISTICS<br>DEPT. AT, PO BOX 952154<br>ATLANTA, GA 31192 | 814-371-3800 | 814-371-3858 | Jamie.Schukle@na.nyklogistics.com |
| $11,286.31 | OPEN FLOW ENERGY<br>SOUTH JERSEY INDUSTRIES<br>LOCK BOX #8411<br>P.O. BOX 8500<br>PHILADELPHIA, PA 19178 | 814-375-9700 | 814-375-1209 | MGARSTKA@SJINDUSTRIES.CO |
| $10,862.26 | MADISON CHEMICAL COMPANY INC<br>3141 CLIFTY DRIVE<br>MADISON, IN 47250 | 323-727-1957 | 323-738-8380 | customerservice@madchem.com |
| $10,601.50 | CHEMSERVE<br>PO BOX 189<br>BIRDSBORO, PA 19508 | 610-327-3888 | 610-718-1294 | |
| $9,515.22 | AMCOR PET PACKAGING<br>10521 S HIGHWAY M-52<br>MANCHESTER, MI 48158 | 843-407-7779 | 734-302-2810 | John.theis@amcor.com |
| $9,000.00 | EW WILLIAMS PUBLICATIONS CO.<br>2125 CENTER AVE.<br>FORT LEE, NJ 07024 | 201-592-7007 | 201-592-2717 | |

HF 6051195v.2 #99999/1000

## Schedule 2

### List of Largest Secured Creditors

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the creditors holding secured claims against the Debtor are listed below. This list has been prepared from the books and records of the Debtor, and in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure, in connection with the filing of the Debtor's case under chapter 11.

The information set forth on the Schedule shall not constitute an admission of liability by, nor is binding on, the Debtor, and the failure to list a claim as contingent, disputed or subject to set-off shall not be deemed a waiver of any of the Debtor's rights related thereto.

| Name of Creditor | Amount of Claim | Type of Collateral | Value of Collateral | Disputed |
|---|---|---|---|---|
| First Commonwealth Bank<br>2 East Long Ave<br>Dubois, PA 15801<br>Tel: 814-375-1904<br>Fax: 814-372-2321<br>krowe@fcbanking.com | $670,000 | Title to land, buildings and equipment | Unknown Value | No |
| Catahama LLC<br>17 East 74th Street<br>New York, NY 10021<br>Tel: 212-744-3585<br>Fax: 212-744-5612<br>catahamallc@hotmail.com | $991,000 | Accounts receivable not pledged to First Commonwealth | Unknown Value | No |

HF 6051195v.2 #99999/1000

# Schedule 3

## Assets and Liabilities of the Debtor

## [SEE FOLLOWING PAGE]

HF 6051195v.2 #99999/1000

Fresh Harvest River
Aggregated Balance Sheet
31-July-2010

**ASSETS**

| | | |
|---|---|---|
| Cash | $ | (954,875) |
| Accounts Receivable | $ | 497,744 |
| Accrued Receipts | | |
| Inventory | $ | 429,554 |
| Total Cash and Short Term Investments | $ | (27,577) |
| | | |
| Other Current Assets: | | |
| Prepaid Expenses | $ | 1,555 |
| Total Other Current Assets | $ | 1,555 |
| | | |
| Total Current Assets | $ | (26,022) |
| | | |
| Fixed Assets: | | |
| | | |
| Property Plant & Equipment: | $ | 916,774 |
| | | |
| Total Property Plant & Equipment | $ | 916,774 |
| | | |
| Accumulated Depreciation: | $ | (69,903) |
| | | |
| Net Fixed Assets | $ | 846,871 |
| | | |
| Total Assets | $ | 820,849 |

**LIABILITIES AND STOCKHOLDERS' EQUITY**

| | | |
|---|---|---|
| Current Liabilities: | | |
| Accounts Payable | $ | 820,956 |
| Other Payables | $ | 831,225 |
| Accrued Expenses | $ | 285,163 |
| Interest Payable-Bank | $ | 3,215 |
| | | |
| Total Current Liabilities | $ | 1,940,559 |
| | | |
| Long Term Liabilities: | | |
| Loans Payable - First Commonwealth | $ | 3,652,393 |
| | | |
| Total Long Term Liabilities | $ | 3,652,393 |
| | | |
| Total Liabilities | $ | 5,592,952 |
| | | |
| Stockholders' Equity | | |
| RETAINED EARNING ADJUSTMENT | $ | (4,772,103) |
| | | |
| Total Stockholders' Equity | $ | (4,772,103) |
| | | |
| Total Liabilities and Stockholders' Equity | $ | 820,849 |

HF 6051195v.2 #99999/1000

## Schedule 4

### List of Owned/Leased/Otherwise Held Premises

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), listed below is the property or premises owned, leased or held under other arrangements by the Debtor from which the Debtor operates its business.

### Owned Property

The Debtor does not own any real property.

### Leased Property

The Debtor does not have any leased property

### Held Under Other Arrangements[2]

| Premises Address | City | State | Zip Code | Country |
|---|---|---|---|---|
| 41 Madison Avenue | New York | NY | 10022 | USA |
| 2592 Oklahoma-Salem Road | Dubois | PA | 15801 | USA |

---

[2] The classification of the contractual agreements listed herein as real property leases or property held by other arrangements is not binding upon the Debtor.

**Schedule 5**

**Location of Debtor's Books and Records**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the Debtor has books and records in its principal offices located at 41 Madison Avenue, New York, New York 10022.

**Location of Debtor's Substantial Assets**

The Debtor's substantial assets consists of its receivables which are located in New York, New York, and the Facility and some equipment located in Dubois, Pennsylvania.

HF 6051195v.2 #99999/1000

## Schedule 6

## Litigation

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following is a list of the actions or proceedings, pending or threatened, against the Debtor or its property where a judgment against the Debtor or a seizure of its property may be imminent.

| Action or Proceeding | Nature of Action | Status of Action |
|---|---|---|
| First Commonwealth Bank v. Fresh Harvest River LLC (No. 2010-        ) (Clearfield County, PA) | Ejectment action to remove FHR from Premises | Judgment entered; FHR obtained stay of enforcement, ordered to post bond. |
| Midlantic Flow Components LLC v. Fresh Harvest River LLC (No. 2010-01082-CD) (Clearfield County, PA) | Writ of execution/attachment | Judgment entered |
| Silgan Plastics Canada, Inc. v. Fresh Harvest River LLC (No. 2010-1471-CD) (Clearfield County, PA) | Action against Debtor for money damages. | Complaint filed |
| First Commonwealth Bank v. Fresh Harvest River LLC (No. 2010-01409-CD) (Clearfield County, PA) | Action against Debtor for money damages. | Judgment entered |
| First Commonwealth Bank v. Fresh Harvest River LLC (No. 2010-01410-CD) (Clearfield County, PA) | Action against Debtor for money damages. | Judgment entered |
| Food Safety Net Services v. Fresh Harvest River LLC (No. 2010-1162-CD) (Clearfield County, PA) | Action against Debtor for money damages. | Default Judgment entered |
| Private Label Publishing Company v. Fresh Harvest River LLC (No. 1042-2010-CV) (Pike County, PA) | Action against Debtor for money damages. | Complaint filed |
| Keystone Logistical Services Inc v. Fresh | Action against Debtor for money damages. | Complaint filed |

HF 6051195v.2 #99999/1000

| Harvest River LLC (No. CV-0000081-10) (Cambria County, PA) | | |
|---|---|---|
| Sheriff's Sale - Cargill | Sheriff's Sale of 1 (one) Fanuc Robot | Sale to be held on September 24, 2010. |
| **Threatened Action** | **Nature of Action** | **Status of Action** |
| Pitney Bowes Global Fincl Srvs. | Account past due | Offer of settlement sent July 9, 2010 |
| McMaster-Carr Supply Co | Account past due | Offer of settlement sent August 3, 2010 |
| Power Quip Inc | Account past due | Demand letter sent January 29, 2010 |
| Pro Refrigeration, Inc. | Account past due | Offer of settlement sent August 27, 2010 |
| Georgia Pacific | Account past due | Demand letter sent July 13, 2010 |

HF 6051195v.2 #99999/1000

## Schedule 7

### Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following is a list of individuals comprising the Debtor's existing senior management, describing their tenure and relevant responsibilities and experience.

| Name/Position | Experience/Responsibilities |
|---|---|
| **Jack Gray, Manager** | <ul><li>**Jack Gray has owned and operated Shofar Kosher Foods, Inc., a kosher meat processing company located in Newark, NJ. He has also imported specialty foods from Italy for the restaurant and food service industry.**</li><li>**His current duties with FHR are to oversee all operations at FHR, to provide strategic planning for plant improvement, sales and operational efficiencies.**</li><li>**In addition, he has devoted considerable time to identifying financial partners in order to furnish FHR with a stable financial base.**</li></ul> |
| **Allan Simpson, COO** | <ul><li>**Manages daily operations of the company, including plant, warehousing, R&D, engineering and maintenance and finance.**</li><li>**Works with sales to develop customers, pricing etc.**</li><li>**Works with ownership on all company related issues.**</li></ul> |

HF 6051195v.2 #99999/1000

# Schedule 8

## Payroll

Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2) (A) and (C), the following provides the Debtor's estimated bi-weekly payroll for employees (not including officers, directors and stockholders), and the estimated amount to be paid to officers, directors, stockholders, and financial and business consultants retained by the Debtor, for the thirty day period following commencement of the Debtor's chapter 11 case.

| | |
|---|---|
| **Payment to Employees (Not including Officers, Directors and Stockholders)** | $107,171.40 |
| **Payments to Officers, Directors and Stockholder** | $10,769.24 |

HF 6051195v.2 #99999/1000

**Schedule 9**

**Cash Receipts and Disbursements,
Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the thirty day period following commencement of its chapter 11 cases, the Debtor's estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

**[SEE FOLLOWING PAGE]**

HF 6051195v.2 #99999/1000

**Fresh Harvest River LLC Estimated Cash Flow - 2010**

9/13-10/12

**Revenue:**

| | |
|---|---:|
| Sales | 280,417 |
| Sales Discounts | 0 |
| | ---------------- |
| Total Revenue | 280,417 |

Cost of Revenue:

| | |
|---|---:|
| Cost of Goods Sold Prod | 42,000 |
| | ---------------- |
| Total Cost of Revenue | 42,000 |
| | ---------------- |

| | |
|---|---:|
| Gross Margin | 238,417 |
| | ---------------- |

**Operating Expenses:**

Employee-Related Expenses:

| | |
|---|---:|
| SALARIES | 60,701 |
| WAGES | 37,700 |
| EMPLOYEE BENEFITS | 33,496 |
| | ---------------- |
| Total Employee-Related Expenses | 131,897 |

Other Operating Expenses:

| | |
|---|---:|
| COMMISSION | |
| ADVERTISING | 10 |
| INSURANCE | 10,555 |
| SAMPLES | 0 |
| RENT | (9,760) |
| FREIGHT FOR INGREDIENTS | 23,183 |
| UTILITIES | 29,055 |
| SALES DEV | 0 |
| TRAVEL SALES | (953) |
| TRAVEL EXECUTIVE | 1,989 |
| COMPUTER UPGRADE AND SUP | 0 |
| LABOR AND OVERHEAD ABSORPTION | (78,976) |
| PLANT SUPPLIES | 11,728 |
| MAINTENANCE | 3,762 |
| TOOLING | |
| DEPRECIATION | 7,659 |
| AMORTIZATION | 0 |
| CONSULTING FEE | 14,108 |
| PROFESSIONAL FEES | 792 |
| MANAGEMENT FEES | 10,000 |
| MARKETING | 5,000 |

HF 6051195v.2 #99999/1000

| | |
|---|---:|
| TAXES | 1 |
| MISCELLANEOUS | 10,507 |
| | ---------------- |
| Total Other Operating Expenses | 38,660 |

Additional Expense Section:
 Interest Exp

| | |
|---|---:|
| | ---------------- |
| Total Additional Expense Section | 0 |
| | ---------------- |

| | |
|---|---:|
| Total Operating Expenses | 170,557 |
| | ---------------- |

| | |
|---|---:|
| Income (Loss) from Operations | 67,860 |
| | ---------------- |

| | |
|---|---:|
| Other Income/(Expense) | |
| INTEREST EXPENSE | 0 |
| BANK FEES | (635) |
| OTHER INCOME | 0 |
| CAP EX | 0 |
| NEW PRODUCT DEVELOPMENT | 0 |
| Gain/Loss on Sale of Asset | 0 |
| | ---------------- |
| Total Other Income/(Expense) | (635) |
| | ---------------- |

| | |
|---|---:|
| Income(Loss) Before Taxes | 67,225 |

HF 6051195v.2 #99999/1000